James **PAUTLITZ**, et al., Plaintiffs,

v.

**CITY OF NAPERVILLE**, Defendant.

No. 89 C 8855.

United States District Court,
N.D. Illinois, E.D.

Jan. 8, 1992.

Mark H. Mennes, Jac A. Cotiguala, Cotiguala & Mennes, Chicago, Ill., for plaintiffs.

Marvin J. Glink, Jennifer Ann Pritz, Ancel, Glink, Diamond & Cope, Chicago, Ill., David Manchester Lefkow, Arnstein & Lehr, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

This matter is before us on the City of Naperville's motion for reconsideration of our September 26, 1991 Order, which granted the Plaintiffs' motion for summary judgment and denied the Defendant's cross-motion. We entertain the motion at this time in large part because of the appearance on September 6, 1991, of an interim final rule, "Exemptions from Minimum Wage and Overtime Compensation Re-

quirements of the Fair Labor Standards Act; Public Sector Employers", 56 Fed. Reg. 45824 (1991), (29 C.F.R. Pt. 541), which was brought to our attention after the final Order had been drafted. For the reasons that follow, we vacate our September 26, 1991 Order insofar as it holds that the policy of supervisory overtime is inconsistent with a salaried status, but we reaffirm our original holding that the impermissible docking of officers' pay for disciplinary infractions undercuts Naperville's argument that the Plaintiffs are salaried employees. Therefore, we stand by our original grant of the Plaintiffs' motion for summary judgment and denial of Naperville's motion.

Because we have detailed the facts in this case in our previous Order we shall not rehearse them at length. It is sufficient to say that the Plaintiffs, who are Naperville police sergeants, have brought suit against the City of Naperville ("Naperville"), alleging that they are non-salaried employees and therefore, pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), they are entitled to payment for overtime hours worked. Naperville contends that the sergeants are salaried employees and are therefore not entitled to overtime compensation.

We ruled that Naperville's policy of providing straight-time payment to sergeants for hours worked in excess of 45 in a given week was an overtime provision inconsistent with a salaried status. The second ground on which we ruled involved Naperville's policy of docking all employees' wages for disciplinary reasons. We found once again that, pursuant to 29 C.F.R. § 541.118(a), Naperville's policy (and its practice) of docking sergeants up to three days' pay was inconsistent with employment on a salary basis. We rejected Na-

perville's attempt to argue that it had docked several sergeants a day's pay for improperly accepting a sandwich on the basis that this behavior was a violation of a "safety rule of major significance" (§ 541.-118(a)(5)).

At the time of our ruling on the original motions, Defendant's counsel informed us of the existence of the interim final rule ("the interim rule") from the Department of Labor, which he had not at that time either seen or brought to our attention.[1] While the interim rule does not directly address the bases on which we grounded our Order, we feel that the sentiment expressed in the background information is germane and worthy of our careful consideration in view of the possibly Draconian effect of our Order on the City of Naperville.

The interim rule addresses the growing tide of dissatisfaction among public sector employees regarding some payment practices that are arguably not aligned with the requirements of the FLSA. When the United States Supreme Court extended the reach of the FLSA to embrace state and municipal employees in *Garcia v. San Antonio Metro Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Act and its implementing regulations were superimposed on complex employment and compensation schemes that had long been in place. The provisions of the FLSA, however, do not distinguish in any way between employees in the private and public sectors.[2] Now recognizing that different treatment may be required, the Department states that it "has been considering (and continues to consider) a variety of possible changes to the regulations governing the exemption for bona fide executive, administrative, and professional employees,

1. The interim rule became effective on the date of publication, September 6, 1991, because the Department of Labor feared a rush to the courthouse by public sector employees. Consequently, "it has been determined that an interim final rule is appropriate to forestall accrual of additional liability while the Department receives and considers comments in the preparation of any final rule which would be determined to be appropriate. Accordingly, the Secretary finds, pursuant to 5 U.S.C. § 553(b)(3)(B), that prior

notice and public comment are contrary to the public interest."

56 Fed.Reg. at 45825.

2. We would note that following *Garcia* Congress passed amendments to the FLSA providing state employers with certain narrow exceptions and postponing the starting date of FLSA coverage until April 15, 1986.

including the particular requirement in the public sector that such employees be paid on a salary basis." 56 Fed.Reg. at 45825.

Until such time as these changes are effected, however, the Department has expressed its concern that the confusion engendered by conflicting judicial interpretations has resulted in

> the exposure of governmental employers to potentially enormous and generally unexpected back wage liabilities to employees, some of whom would clearly be exempt if duties and amount of compensation alone were examined. Such unforeseen liabilities could seriously threaten the fiscal integrity of State and local governmental agencies, and could seriously disrupt widespread pay practices that were designed and intended to serve the public trust and were established' long before State and local government employees were subject to the Fair Labor Standards Act.
>
> . . . .
>
> These pay systems are generally premised on the concept—based on principles of public accountability—that governmental employees should not be paid for time not worked, and that there is a need to be accountable to the taxpayers for the expenditure of public funds.

*Id.* Consequently, the Department has proposed the following additions to 29 C.F.R. § 541:

> § 541.118 Salary basis.
>
> (a) * * *
>
> (b) * * *
>
> (ii) If a Federal, State or local government (i.e. public sector) employer's pay system is as described in § 541.5d, and either:
>
> (A) the public employer has made no actual deductions from the pay of other-

wise-exempt public employees for absences, for personal reasons or because of illness or injury, of less than one work-day before the effective date of § 541.5d (i.e., September 6, 1991); or,

> (B) The employer reimburses any otherwise-exempt public employees for deductions from salary that were made for absences, for personal reasons or because of illness or injury, of less than one work-day occurring before the effective date of § 541.5d (i.e., September 6, 1991); then eligibility for exemption for public employees who otherwise meet the requirements of § 541.118 and who were subject to such pay system will not be defeated for failure to pay "on a salary basis."
>
> § 541.5d Special Provisions Applicable to Public Sector Employers (Federal, State and Local Governments)
>
> (a) A Federal, State or local government employee ("public employee") who otherwise meets the requirements of § 541.118 shall not be disqualified from exemption under §§ 541.1, 541.2, or 541.3 of this part on the basis that such employee is paid according to a pay system established by statute, ordinance, regulation or public policy under which the employee accrues personal leave and sick leave and, absent the use of such accrued leave (because the leave has been exhausted or by the employee's choice), requires the public employee's pay to be reduced ("leave without pay") for absences, for personal reasons or because of illness or injury, of less than one work-day.[3]
>
> (b) Deductions from a public employee's pay that are not regular and recurring for absences due to a budget-required furlough shall not disqualify the employee from being paid "on a salary

---

**3.** This new provision would appear to bear directly on one of the arguments advanced by the Plaintiffs (which we did not address in our Order). The Plaintiffs had originally argued that Naperville's policy of not compensating sergeants for hours not worked unless they have credits available from their "benefit books" (vacation, sick leave, personal leave, supervision day, or extended sick leave time). When these accrued leave days have been exhausted, Naperville allegedly then only pays the sergeants for the actual number of hours worked. Apparently this scheme is fairly widespread and has been the source of conflicting judicial interpretations. *See, e.g., Abshire v. County of Kern,* 908 F.2d 483 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 785, 112 L.Ed.2d 848 *rehr'g denied,* —— U.S. ——, 111 S.Ct. 1341, 113 L.Ed.2d 272 (1991) (and other cases cited at 56 Fed.Reg. at 45828). The interim rule would appear to allow the use of such a system without jeopardizing salaried status.

basis" except in the workweek in which such deductions occurred.

While the interim rule does not directly address the concerns that led us to grant summary judgment to the Plaintiffs, it does convince us that we should pause to consider the context and implications of our Order. We shall now re-visit the bases for our original Order in light of the considerations raised by the interim rule.

## I. *Overtime Payments*

 In 1989, Naperville adopted a policy of paying straight overtime to sergeants for hours worked in excess of 45 in a given workweek. This "Supervisory Overtime" policy was allegedly introduced to address the anomalous situation wherein non-salaried employees could regularly out-earn their salaried supervisors by virtue of their ability to earn overtime. As we have noted, the language of the FLSA does not *preclude* the payment of sums in excess of regular salary to salaried employees:

> [T]he salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides the salary is not inconsistent with the salary basis of payment. The requirement will be met, for example, by a branch manager who receives a salary of $155 or more a week and in addition, a commission of 1 percent of the branch sales. The requirement will also be met by a branch manager who receives a percentage of the sales or profits of the branch, if the employment arrangement also includes a guarantee of at least the minimum weekly salary ...

29 C.F.R. § 541.118(b).

We threw our lot in with the cases that found payment of overtime in any form to be inconsistent with a salaried status. On further consideration, we conclude that, given the purpose of the supervisory overtime policy to reduce inequities in compensation and to award salaried employees for commitment to their duties beyond the standard week, the better position would be to consider this additional remuneration to be a bonus scheme. *See Dole v. Malcolm Pirnie, Inc.,* 758 F.Supp. 899, 903 (S.D.N.Y.1991), *rev'd on other grounds, Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611 (2d Cir.1991).[4] Indeed, the method of calculating this "incentive" or "bonus" compensation is reasonable, geared as it is directly to the amount of extra commitment demonstrated by the supervisor. We are also sensitive to the fact that such a scheme is designed to improve morale among officers and that perhaps this attempt on the part of Naperville should be applauded rather than penalized. Therefore, we vacate our earlier finding that the payment of "supervisory overtime" defeats exempt status.

## II. *Docked Pay for Disciplinary Infractions*

The more troublesome element is Naperville's policy of docking all personnel up to three days' pay for various disciplinary infractions.[5] According to 29 C.F.R. § 541.118(a),

> [a]n employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his

---

**4.** We also note that only two weeks after we originally ruled, the Fifth Circuit Court of Appeals reversed *York v. City of Wichita Falls, Tex.,* 727 F.Supp. 1076 (N.D.Tex.1989), one of the cases on which we had relied for the proposition that such overtime provisions were inconsistent with a salaried status. The court in *York v. City of Wichita Falls, Tex.,* 944 F.2d 236, 242 (5th Cir.1991), cited *Hartman v. Arlington County, Va.,* 720 F.Supp. 1227, 1229 (E.D.Va.1989), for the proposition that such overtime would not defeat salaried status.

**5.** As we cited in our previous Order, the Naperville Employee Handbook provided for suspension without pay: "This is a temporary removal from employment, accompanied by a concurrent and temporary loss of wages. The Department Head has the authority to implement a suspension of an employee up to a maximum of three days." Presumably such a provision (which is clearly not limited to nonsupervisory personnel) could result in suspensions without pay for full days or fractions thereof.

compensation, *which amount is not subject to reduction because of variations in the quality or quantity of the work performed.* Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work. (emphasis supplied)

■ We rejected Naperville's rather bloodless argument that it had docked three officers for improperly accepting sausage sandwiches during Naperville Fest because they had violated a "safety rule[ ] of major significance."[6] The Notice of Suspension, however, clearly says that the suspension was occasioned by violation of the policy prohibiting acceptance of gratuities. We found such a scheme antithetical to the notion of a salaried employee under the FLSA.

■ Naperville now returns to us having recently altered its suspension policy to conform to the FLSA. (Def's Exh. No. 4.) It also submits documentation proving that it has reimbursed seven officers for unpermitted suspensions. (Def's Exh. No. 3.)[7] Consequently, Naperville now argues that it has availed itself of the "window of correction" provided for in § 541.118(a)(6) by altering its policy and reimbursing its

otherwise salaried personnel and is therefore entitled to the relief offered by the following language:

> [W]here a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

29 C.F.R. 541.118(a)(6).

The Plaintiffs assert that this rather tardy attempt to mend the fence is ineffective inasmuch as the suspensions were far from inadvertent. Indeed, the suspensions were made pursuant to a clearly written policy, and Naperville originally maintained that such power is essential to maintaining discipline in the force.[8] The "window of correction" argument was recently rejected by the Second Circuit when it reversed the district court's finding that the municipality had properly employed the scheme to preserve exempt status. *Martin*, 949 F.2d 611, *reversing Dole*, 758 F.Supp. 899. The *Martin* court determined that the existing policy belied the notion that the deductions were inadvertent in any sense. In this respect the Second Circuit falls into step with the Ninth Circuit in *Abshire v. County of Kern*, 908 F.2d 483, 489 (9th Cir. 1990), which said that

---

**6.** While 29 C.F.R. § 541.118(a)(5) is quite clear that

> [p]enalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried status[,] [s]afety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines.

Naperville now argues that this provision is excessively narrow and outmoded, given the current reach of the FLSA. This may be so, but Congress, not the courts, must address Naperville's concerns. We toyed with the notion that, almost by definition, disciplinary infractions by law enforcement personnel could be construed as safety violations inasmuch as any breakdown in discipline may be seen ultimately to jeopardize public health and safety. However, such considerations would find a more comfortable home on a legislator's agenda.

**7.** In addition to compensating the sergeants for pay docked as a consequence of the sausage sandwich incident, Naperville also compensated other personnel, including most recently an officer whose paycheck was reduced after he intentionally exposed to public view a portion of his anatomy that decency requires remain clothed.

**8.** While the threat of suspension without pay is certainly a deterrent to misconduct among any employee group, we are not completely convinced that it is the *sole* effective method. As we pointed out to counsel for Naperville, other effective deterrents may include the threat of demotion, failure to promote, lack of "merit pay", and unfavorable job assignments. In any case, we have no quarrel with Naperville's use of this disciplinary measure with personnel who are not eligible for exempt status.

[t]he exception in subsection (6) is for an employer that makes a one-time improper deduction and then corrects its error. This provision is of no relevance in the case of an employer that, like the county of Kern, has adopted an express policy. . . .

We must acknowledge, therefore, that the clear weight of authority suggests that Naperville's corrective action was too little, too late. The deductions that Naperville made were not simply one-time slip-ups but routine matters.[9]

■ Finally, Naperville has proposed a reading of the regulations that would permit even intentional (and presumably policy-driven) deductions to be excused. Naperville notes that § 541.118(a)(6) states that the "window of correction" is available "where a deduction not permitted by these interpretations is inadvertent, *or is made for reasons other than lack of work*, to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future." Naperville would have us ignore the inadvertency language that has almost uniformly been deemed essential to the employment of the § 541.118(a)(6) "window." Because the phrase highlighted above is disjunctive, Naperville argues that the correction option remains open because the disciplinary deductions were clearly made "for reasons other than lack of work."

This is the reading relied upon very recently, without elaboration, in *Keller v. City of Columbus, Indiana*, 778 F.Supp. 1480 (S.D.In.1991). We find more persuasive the careful analysis of this phrase accomplished in *Dole*, 758 F.Supp. at 905–906, *rev'd on other grounds, Martin*, 949 F.2d 11. The *Dole* court noted that we must defer to the administrator's interpretation of its own regulations, but here there has been no such interpretation. *Dole*, 758 F.Supp. at 905. The court went on to comment, and we agree, that the better reading of the regulation is in the conjunctive, requiring that the deductions have been made both inadvertently and for reasons other than lack of work. To read the regulation in this fashion would "prevent the incongruous situation of employers cynically undertaking corporate policies which subject the salaries of their professional, managerial and administrative employees to reduction for reasons other than lack of work, knowing that the exempt status of the affected employees would be restored through reimbursement and promise to comply, if the employer is caught." *Id.* at 906–07.

*Conclusion*

On a second consideration of this issue, we find that our original ruling must stand, although we agree with Naperville that our decision regarding the supervisory overtime policy should be vacated. Returning to the essentials of the FLSA for a moment, we recall that § 541.118(a) defines "salary basis" as receipt of "a predetermined amount . . . which amount is not subject to reduction because of variations in the quality or quantity of the work performed. . . . [T]he employee must receive his full salary for any week in which he

---

9. We also reject a related argument. An 1986 Department of Labor, Wages and Hours Division, Letter Ruling January 15, 1986, states that when an employer makes an occasional impermissible deduction (not deductions that are regular and recurring), the employee's exempt status will not be totally destroyed, but the employee will be deemed non-exempt for the workweek during which the deduction was made. *See District of Columbia Nurses' Ass'n v. District of Columbia*, 29 WH (BNA) 868 n. 1, 1988 WL 156191 (D.D.C. Jan. 28, 1988) (relying on this Ruling to preserve exempt status). The Ninth Circuit in *Abshire v. County of Kern*, 908 F.2d 483, 488 (9th Cir.1990), however, rejected the use of this Letter Ruling in situations, such as the one before us, where the deductions were made pursuant to a clear policy. That court said:

> Where there is an occasional deduction made because of an error on the part of a government entity or because of an individual decision by a supervisor, there is good reason to say that the affected employee's status will be changed only for the week in which the unpermitted deduction was made. *Cf.* § 541.-118(a)(6) (where individual error made and corrected). But where an employer deliberately adopts a policy rendering employees' pay *'subject to'* deduction for unpermitted reasons, the frequency with which an employer is forced to apply that policy is irrelevant. *Id.*

**1374**

performs any work without regard to the number of days or hours worked." It is clear to us that in Naperville between the date in 1986 when the FLSA came into effect and the date of the change in policy, police sergeants' paychecks were "subject to" reduction (and were reduced on several occasions) for disciplinary reasons. Naperville has not convinced us that this conduct may be excused. Consequently, we find that this policy was inconsistent with employment on a salary basis, and we deny Naperville's motion to reconsider our earlier Order granting summary judgment to the Plaintiffs.

This is a tough outcome for Naperville. This area of the law is currently churning, and federal courts issue often contradictory opinions on a daily basis. The interim final rule only begins to address the types of problems faced by local governments because of their negligence (or unwillingness) to bring their policies into line with the FLSA, but we decline to extend the reach of the interim rule's forgiveness too far beyond its language. At some point public sector employers must be held to answer for their conduct.